617 P.2d 160

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Manuel RUIZ, Defendant–Appellant.**

**No. 4431.**

Court of Appeals of New Mexico.

Aug. 26, 1980.

John B. Bigelow, Chief Public Defender, Melanie S. Kenton, Asst. Appellate Defender, Santa Fe, Roger A. Wagman, Asst. Public Defender, Mark Shapiro, Asst. Appellate Defender, Albuquerque, for defendant–appellant.

Jeff Bingaman, Atty. Gen., Walter G. Lombardi, Asst. Atty. Gen., Santa Fe, for plaintiff–appellee.

## OPINION

WOOD, Chief Judge.

Convicted of burglary, defendant appeals. We discuss three issues: (1) failure to admit hospital records; (2) instruction on defendant's competency to make a statement; and (3) whether criminal trespass was a lesser offense included within burglary. Other issues listed in the docketing statement were not briefed and, thus, were abandoned. *State v. Brown*, 93 N.M. 236, 599 P.2d 389 (Ct.App.1979).

The first two issues involve defendant's use of PCP (phencyclidine, known as "angel dust").

The victim discovered the burglary of his residence about 9:00 p. m. Various items of property were missing from the residence. At 9:47 p. m. police officers arrived at the residence. The victim found some of his missing property in his neighbor's yard. More property was found in nearby yards. Defendant was also found in a nearby yard, in an apparently unconscious state, lying on his back with the victim's property on his chest and nearby.

The officer who discovered defendant tried to talk to, and revive defendant, who responded only with moaning. The rescue squad was called; defendant was taken to a hospital by ambulance. Defendant arrived at the hospital at 10:55 p. m.

Dr. Tandberg, the emergency room physician, had his attention directed to defendant within a minute of defendant's arrival in the emergency room. Defendant was acting in a bizarre manner; he was thrashing about, screaming and trying to bite people. Nothing anyone said to defendant seemed to register; it took ten people to subdue defendant. Dr. Tandberg administered a sedative, which rapidly brought defendant out of his confusion and, although not completely oriented, defendant was able to communicate in some degree.

Dr. Tandberg testified that defendant's symptoms in the emergency room were a classic case of a PCP reaction; his diagnosis was a PCP overdose. That defendant was suffering from such an overdose when admitted to the emergency room of the hospital is not disputed. There is evidence that PCP has undesirable side effects which include psychotic–like behavior while under its influence and an impairment of memory for events occurring while under its influence. The first issue is concerned with defendant's statement at the emergency room concerning his use of PCP. The second issue is concerned with the consequences of the use of PCP on defendant's competency to make a statement to the police about three weeks later.

*Failure to Admit Hospital Records*

Defendant sought to have the hospital records of his emergency room admission and treatment admitted as exhibits. The trial court refused to admit them.

■ Burglary, as defined in § 30–16–3, N.M.S.A. 1978, requires that entry be with the specific intent to commit a felony or theft. *State v. Elliott*, 88 N.M. 187, 539 P.2d 207 (Ct.App.1975), rev'd on other grounds, 89 N.M. 756, 557 P.2d 1105 (1977). Intoxication may be shown to negate this specific intent. *State v. Gonzales*, 82 N.M. 388, 482 P.2d 252 (Ct.App.1971).

Defendant did not contend that he did not take property from the residence of the victim. His defense was that because of being under the influence of PCP, he had no intent to commit a theft upon entry. His "no intent" defense depended on the manner and time of ingesting the PCP, and the amount ingested.

There is testimony that if PCP is smoked, inhaled or taken intranasally, the PCP takes effect in about 15 minutes. The symptoms depend on the amount of the dosage. With high doses, PCP acts as a coma–producing drug. At moderate to high doses, PCP causes psychotic–like activities. PCP affects the brain chemically, so that the user's perception is out of tune with reality. PCP affects the user's ability to speak, think, perceive and form concepts.

Defendant's statement to Dr. Ferraro was in evidence. The statement was that the PCP was ingested between 6:00 and 7:00 p. m. on the evening the victim's house was entered. The evidence shows that this statement was made by defendant in preparation for trial and, thus, according to the prosecutor's statement to the jury during closing argument, made the statement suspect.

Other evidence of the time of ingestion of the PCP was in the emergency room records excluded from evidence. The prosecutor did not refer to the excluded evidence in closing argument. However, the importance of the excluded evidence appeared in the prosecutor's argument that "all" the other evidence before the jury contradicted the statement defendant made to Dr. Ferraro as to the time of ingestion. The prosecutor recognized that defendant could not have had an intent to steal at the time he was discovered in a neighboring yard. However, because of evidence that defendant had ingested the PCP by smoking and "snorting," and because the effect from this method may appear within 15 minutes, a permissible inference, argued by the prosecutor, was that the PCP was taken *after* entry and had no bearing on defendant's intent upon entry. Thus, the excluded evidence in the emergency room records was crucial to the "no intent" defense.

On appeal, the State suggests that the answer to the question of excluding the emergency room records is simply that the admission or exclusion of evidence is a matter of the trial court's discretion. See *State v. Maestas*, 92 N.M. 135, 584 P.2d 182 (Ct. App.1978). That is the starting point; the question is whether the exclusion was an abuse of discretion. In this case, the evidence excluded was crucial to the "no intent" defense. If the records were admissible under evidence rules, it was an abuse of discretion to exclude them.

The excluded records report that defendant stated he had smoked and snorted PCP. This not only was cumulative of evidence that was admitted, the method of ingestion was not in dispute. The excluded records show that defendant related that he had smoked "different" marijuana around 7:00 p. m. and shortly thereafter became acutely confused and disoriented. The excluded records also show that the marijuana was purportedly rolled in PCP. This "time" statement, if admitted, would have supported the "no intent" defense.

The exclusion of the records involves a question of double hearsay. The first hearsay question goes to the records; the second hearsay question goes to the time statement contained in the records. As stated in McCormick's Handbook of the Law of Evidence, § 313A (2nd Ed., 1972) at 731:

> Under standard practice, a trained attendant at hospitals enters upon the record a "personal history," including an identification of the patient and an account of the present injury or illness and the events and symptoms leading up to it. ... This, of course, is the "double hearsay" problem. The first issue is whether the hospital record is admissible to prove that the statement was made. This is a matter of application of the regularly kept records rule, and the primary issue is whether or not the specific entry involved was an entry made in the regular course of the hospital's business. If the subject matter falls within those

things which under hospital practice are regarded as relevant to diagnosis or treatment, it is within the regular course of business. . . .

More difficult problems are often raised by the application of the second step of the "double hearsay" problem analysis. . . . . In accordance with the general rule, it seems clear that the business record exception cannot support use of the history because the declarant's action in relating the history was not part of a business routine of which he was a regular participant. Here as elsewhere, however, if the history comes within one of the other exceptions to the hearsay rule it is admissible. For example, insofar as the history was given to a physician consulted for treatment and is reasonably related to diagnosis and treatment, it may be admissible under the exception for such spontaneous statements.

Both hearsay questions are answered by Evidence Rule 803(4) and (6) (Judicial Pamphlet 10, N.M.S.A. 1978, Cum.Supp. 1980). It reads:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(4) *Statements for purposes of medical diagnosis or treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment;

\* \* \* \* \* \*

(6) *Records of regularly conducted activity.* A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memoran-

dum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicated lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit[.]

The State would uphold exclusion of the records because they were offered through the testimony of Dr. Tandberg. The State's argument that Dr. Tandberg was not the custodian of the records does not answer the question of admissibility; the records could be admitted if the foundation requirements for admissibility came through the "testimony of the custodian *or other qualified witness*". (Our emphasis.) Evidence Rule 803(6), supra. *State v. Ramirez*, 89 N.M. 635, 556 P.2d 43 (Ct.App.1976) comments that to be "qualified" the witness must be able to testify as to the mode of preparation of the record and its safekeeping. 4 Weinstein's Evidence, ¶ 803(6)[02] (1979) at 803–152, states: "The phrase 'other qualified witness' should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system." Our view is that a witness is "qualified" if able to testify to the foundation requirements stated in Evidence Rule 803(6), supra.

The State does not claim that Dr. Tandberg's testimony did not meet the foundation requirements of Evidence Rule 803(6), supra. Its argument is that in the absence of the custodian, the only other "qualified" witness would be the person who actually prepared the records. There is no requirement that to be qualified, the witness must have been the person who prepared the records. Dr. Tandberg's testimony having met the foundation requirements, he was a qualified witness. The foundation requirements having been met, the records were not to be excluded under Evidence Rule 803(6), supra, on the basis that they were hearsay. The trial court erred in so ruling.

■ Defendant's statement as to "time" was made to an intern and entered in the records by the intern. The trial court had limited Dr. Tandberg's testimony to his personal knowledge. Defendant's statement to the intern was not within the doctor's personal knowledge and thus, if testified to by Dr. Tandberg, it would have been hearsay. This answers the State's claim that Dr. Tandberg could have testified about defendant's statement to the intern.

■ Evidence Rule 803(4), supra, provides that statements made for purposes of medical diagnosis and treatment are not excluded by the hearsay rule, including statements as to the cause "insofar as reasonably pertinent to diagnosis or treatment[.]" The State contends that a statement as to the time the PCP was ingested was not reasonably pertinent, either to diagnosis or treatment.

*Weinstein*, supra, ¶ 803(4)[01], at 803–130 states: "Since doctors may be assumed not to want to waste their time with unnecessary history, the fact that a doctor took the information is prima facie evidence that it was pertinent." The fact that the statement was made to, and recorded by, an intern rather than Dr. Tandberg, did not make the statement inadmissible. *Weinstein*, supra, at 803–127 comments: "[S]tatements to hospital attendants, ambulance drivers, or even members of the family may be admissible provided they are made for purposes of diagnosis or treatment."

The intern's record recommends that defendant should be observed for possible convulsions and to prevent defendant from doing bodily harm to himself. The intern's record states that defendant was unable to give a "lucid" history. In these circumstances, the defendant's statement of the time he ingested the PCP was reasonably pertinent to his treatment.

The exclusion of the emergency room records, offered by defendant, was an abuse of discretion and reversible error.

## Instruction on Defendant's Competency to Make a Statement

The entry into the victim's home occurred on December 15, 1978. Defendant gave a statement to the police on January 10, 1979. The statement in essence, was a confession to the burglary. It specifically contradicts the "no intent" defense with the words "I broke the window an [sic] Carl Ross reached in and opened the door, that's when we just started going crazy." The statement refers to "getting drunk" with Carl, and while looking for someone to get them "more booze" they went to the victim's home; that after taking goods from the victim's home, and leaving, defendant "passed out". The statement made no mention of the undisputed fact that defendant had ingested PCP and had suffered from an overdose of PCP.

Defendant objected to admission of the January 10th statement on the basis that he was not competent to make the statement. The objection was overruled. Defendant requested the jury be instructed to determine that the statement "was given competently" before considering the statement for any purpose. The requested instruction was refused. The issue is whether the trial court's refusal was error.

Two matters are not involved in this issue.

The first matter is that the evidence, at trial, was conflicting as to defendant's competency to make a statement on January 10th about events occurring on the preceding December 15th. There is no claim of an absence of evidence to support an instruction. Evidence going to incompetency was: (a) that PCP in high doses impairs the ability to remember; (b) that the high dosage indicated by defendant's behavior in the emergency room made any remembrance by defendant of the events of December 15th unreliable; (c) that defendant had no memory of the alleged burglary; (d) that defendant gave the statement of January 10th because the police told him how it happened during the pre–statement discussion; (e) the lack of reference in the January 10th statement to any use of PCP.

The second matter goes to whether the judge or the jury should decide whether a defendant was competent to give a statement. The New Mexico decisions go to the test for determining competency rather than to who makes that determination. *State v. Manus*, 93 N.M. 95, 597 P.2d 280 (1979); *State v. Lujan*, 87 N.M. 400, 534 P.2d 1112 (1975), cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 400 (1975); *State v. Sisneros*, 79 N.M. 600, 446 P.2d 875 (1968); *State v. Chavez*, 88 N.M. 451, 541 P.2d 631 (Ct.App.1975). In *Sisneros*, the issue of competency to give a statement was submitted to the jury; in *Manus*, supra, competency to give a statement was recognized as an aspect of the voluntariness of a statement. U.J.I.Crim. 40.40 instructs the jury to determine the voluntariness of a statement after, of course, a prior determination of voluntariness by the judge. *State v. Ramirez*, supra. There is no claim that the issue of defendant's competency to give a statement was not a matter for the jury to decide.

The refused instruction was:

Evidence has been admitted concerning a statement allegedly made by the Defendant. Before you consider such statement for any purpose, you must determine that the statement was given competently. In determining whether the statement was competently given, you should consider if Manuel Ruiz had the capacity of be conscious of the events which occurred at the time of the alleged burglary, whether he could retain those events in his memory, and whether he could recall them with reasonable accuracy.

The test for competency in *State v. Manus*, supra, is:

"[T]he defendant must have had sufficient mental capacity at the time he made the statement, to be conscious of the physical acts performed by him, to retain them in his memory and to state them with reasonable accuracy."

■ The State contends the requested instruction was properly refused because an incorrect statement of the law. The State asserts that the requested instruction was incorrect under *State v. Manus*, supra. The State argues that the phrase in the requested instruction, requiring defendant to have the capacity "to be conscious of the events which occurred at the time of the alleged burglary" is somehow a departure from the requirement in *Manus*, supra, that defendant have the capacity " 'to be conscious of the physical acts performed by him.' " The language in the requested instruction was not a sufficient departure from the language in *Manus*, supra, to make the requested instruction an incorrect statement of law. Another departure from *Manus*, supra, is the failure of the requested instruction to specifically state that the tests are to be applied at the time the statement was made. The requested instruction indicates the appropriate time, however, with the words "[i]n determining whether the statement was competently given". Again, this departure was insufficient to make the requested instruction an incorrect statement of law. On retrial, however, we recommend use of the *Manus*, supra, language.

The State also contends that the requested instruction was properly refused because the trial court had no authority to give the requested instruction. The trial court gave U.J.I.Crim. 40.40 as it appears in Judicial Pamphlet 19, N.M.S.A.1978. Because U.J.I. Crim. 40.40 goes to the voluntariness of statement, the State contends that no additional instruction was authorized. This argument is based on the statement in the General Use Note: "When a uniform instruction is provided for * * * a general explanatory instruction on evidence * * the uniform instruction must be used without substantive modification or substitution." See *State v. Blakley*, 90 N.M. 744, 568 P.2d 270 (Ct.App.1977). The General Use Note, however, authorizes additional instructions for "subject matters not covered by a uniform instruction". The answer to whether the requested instruction was authorized depends on whether U.J.I.Crim. 40.40 covered the subject matter of the requested instruction.

The trial court refused the requested instruction, not on the basis that it was an incorrect statement of law and not on the basis that it was unauthorized, but on the basis that the defendant's competency was adequately covered by U.J.I.Crim. 40.40. We disagree.

U.J.I.Crim. 40.40 reads:

Evidence has been admitted concerning a statement allegedly made by the defendant. Before you consider such statement for any purpose, you must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given, you should consider if it was freely made and not induced by promise or threat.

This instruction requires the jury to determine whether the statement was voluntary—"freely made and not induced by promise or threat." Although competency to give a statement is an aspect of voluntariness, *State v. Manus, supra,* U.J.I.Crim. 40.40 gives no hint that in determining voluntariness the jury was to determine competency under the tests stated in *Manus, supra.*

U.J.I.Crim. 40.40 does not cover the question of defendant's competency to give a statement. The question of competency not being covered by a uniform instruction, the requested instruction was authorized. The trial court erred in refusing the requested instruction, which would have required the jury to determine whether defendant was competent to give the statement of January 10th.

*Criminal Trespass as a Lesser Offense Included Within Burglary*

Defendant requested that the jury be instructed on criminal trespass as a lesser offense included within burglary. Because the case is to be remanded for a new trial, we answer the merits of this contention. However, the trial court did not err in refusing the instruction requested because it was not a correct statement of the law.

(a) *Criminal Trespass as an Offense Included Within Burglary*

The jury may find the defendant guilty of an offense necessarily included in the offense charged. R.Crim.Proc. 44(d). Whether the offense is necessarily included is determined by looking to the offense charged. The question is whether the greater offense, which is charged, can be committed without also committing the lesser. *State v. Armijo,* 90 N.M. 614, 566 P.2d 1152 (Ct.App.1977).

The offense of burglary is defined in § 30–16–3, supra, as follows:

Burglary consists of the unauthorized entry of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, with the intent to commit any felony or theft therein.

A. Any person who, without authorization, enters a dwelling house with intent to commit any felony or theft therein is guilty of a third degree felony.

B. Any person who, without authorization, enters any vehicle, watercraft, aircraft, or other structure, movable or immovable, with intent to commit any felony or theft therein is guilty of a fourth degree felony.

The offense charged was burglary of a dwelling house; thus, we are not concerned with vehicles, watercraft or aircraft, or other structures.

Burglary of a dwelling house requires an unauthorized entry of a dwelling house with the intent, at time of entry, to commit a felony or theft therein. See *State v. Ortiz,* 92 N.M. 166, 584 P.2d 1306 (Ct.App. 1978).

The offense of criminal trespass of private property is defined in § 30–14–1(A), N.M.S.A.1978 (Cum.Supp.1980) as follows:

A. Criminal trespass consists of unlawfully, and with malicious intent, entering or remaining upon the lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof.

The asserted lesser offense identified in defendant's requested instruction was trespass by either entering or remaining on the property of the victim. Burglary

is concerned with the initial entry; unlawfully remaining on property is not involved in burglary. Because burglary can be committed without committing a trespass by unlawfully remaining on property, the unlawfully remaining aspect of criminal trespass is not included within the offense of burglary of a dwelling house. Compare *State v. Rogers*, 83 N.M. 676, 496 P.2d 169 (Ct.App.1972); see also, *State v. Tanton*, 88 N.M. 333, 540 P.2d 813 (1975). The requested instruction was properly refused because an incorrect statement of the law. *State v. Robertson*, 90 N.M. 382, 563 P.2d 1175 (Ct. App.1977).

Whether criminal trespass, based on entry, is a lesser offense included within burglary of a dwelling house, requires a comparison of the statutory provisions.

■ Such a burglary requires an entry without authorization. Such a criminal trespass requires an unlawful entry knowing that consent to enter is denied or withdrawn. An unlawful entry is an entry not authorized by law, without excuse or justification. *State v. Noble*, 90 N.M. 360, 563 P.2d 1153 (1977). Such an entry, for criminal trespass, is committed by committing the unauthorized entry required for burglary. The required knowledge for criminal trespass is knowledge that there is no consent to enter. Such knowledge is included with the unauthorized entry required for burglary. *State v. Ortiz*, supra.

■ Burglary of a dwelling house requires entry of a dwelling house. Criminal trespass requires entry of "lands of another". The State seems to argue that such a burglary can be committed without entering upon the lands of another. We disagree. "Lands" in § 30–14–1(A), supra, includes buildings and fixtures, and is synonymous with real property. *People v. Brown*, Cal.App., 47 Cal.Rptr. 662 (1975); see § 47–1–1, N.M.S.A.1978. When one enters another's dwelling house, under our burglary statute, one has entered lands of another. This reasoning, of course, would not apply if the burglary was of a vehicle, watercraft or aircraft.

■ Burglary of a dwelling house requires an entry with the intent to commit a felony or theft therein. Criminal trespass, based upon entry, requires an entry with malicious intent. When one intends to commit a felony or theft under the burglary statute one also has the general criminal intent of purposely doing an act even though he may not know the act is unlawful. See U.J.I.Crim. 1.50.

■ The "lesser included" issue on intent is whether an intent to commit a felony or theft is also a malicious intent. The meaning of "malicious" depends upon the context in which the word is used. *Rea v. Motors Ins. Corporation*, 48 N.M. 9, 144 P.2d 676 (1944) held that a malicious injury contemplates the infliction of a wrongful injury with an intention to injure. *Potomac Insurance Company v. Torres*, 75 N.M. 129, 401 P.2d 308 (1965) held that malicious damage involved the intentional doing of a harmful act without just cause or excuse or an intentional act done in utter disregard of the consequences. Both *Rea* and *Potomac* utilize "intent" in defining malicious conduct. Inasmuch as our question involves an intent which is malicious, neither decision is applicable. *Potomac* is also distinguishable in that it uses "without just cause or excuse" in defining malicious damage; the absence of cause or excuse is covered in the criminal trespass statute by the word "unlawful".

■ The only "act" involved in criminal trespass as a lesser offense included within burglary of a dwelling house is entry upon the lands of another. That act requires a "malicious intent". In this context, malicious intent means "malice, in the popular sense of hatred or ill will." *Conner v. Standard Pub. Co.*, 183 Mass. 474, 67 N.E. 596 (1903). This hatred or ill will imports "a wish to vex, annoy, or injure another person or an intent to do a wrongful act." *Briggs v. Coykendall*, 57 N.D. 785, 224 N.W. 202 (1929). See also *State v. Cannady*, 18 N.C. App. 213, 196 S.E.2d 617 (1973).

When one enters a dwelling house with the intent to commit a felony or theft

therein, one enters with ill will; that is, to vex, annoy, injure, or do a wrongful act and thus enters with malicious intent.

When one commits burglary of a dwelling house one also commits a criminal trespass based on that entry.

(b) Before error can be predicated upon a failure to instruct on a lesser included offense there must be evidence tending to establish the lesser offense. *State v. Aubrey*, 91 N.M. 1, 569 P.2d 411 (1977). In refusing the requested instruction, the trial court ruled there was no evidence of malicious intent; " 'Had there been some damage to the property, throwing around of things, then maybe a lesser included offense of criminal trespass would be appropriate.' " While damage to property would be evidence of malicious intent, such is not required inasmuch as malicious intent may be established by evidence of an intent to vex or annoy or do a wrongful act. The evidence in this case of an intent to commit a felony or theft was also evidence of intent to vex, annoy or do a wrongful act. The trial court erred in ruling that there was an absence of evidence of malicious intent.

The judgment and sentence are reversed; the cause is remanded for a new trial.

IT IS SO ORDERED.

HENDLEY and WALTERS, JJ., concur.