682 P.2d 742

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Kenneth McCORMACK,
Defendant-Appellant.**

No. 5732.

Court of Appeals of New Mexico.

April 12, 1984.

Paul Bardacke, Atty. Gen., Marcia E. White, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Dan A. McKinnon, III, Paul A. Phillips, Albuquerque, for defendant-appellant.

## OPINION

NEAL, Judge.

This appeal raises issues concerning the intent required to sustain a conviction under our criminal trespass statute, NMSA 1978, Section 30–14–1 (Cum.Supp.1983), and the First Amendment.

The defendant, Kenneth McCormack, is a freelance journalist. On Labor Day 1981, while covering a demonstration at the Waste Isolation Pilot Plant (WIPP) site near Carlsbad, he crossed a police barricade and was arrested and charged with criminal trespass. The court found him guilty, sentenced him to thirty days in the Eddy County jail, and fined him $500.00; the jail sentence was suspended.

■ The defendant appealed to this Court. We reversed holding that Section 30–14–1 was inapplicable because the WIPP site was on federal land. The Supreme Court reversed and remanded the case to us for consideration of the remaining two issues, which concern the First Amendment and intent. *State v. McCormack*, 100 N.M. 657, 674 P.2d 1117 (1984). Another issue, listed in the docketing statement but not briefed, is abandoned. *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App.1976).

The Waste Isolation Pilot Plant is a project of the United States government. It is an experimental project which deals with the disposal of nuclear waste. The WIPP site is located about twenty-three miles east of Carlsbad in remote and empty country. It includes a construction yard where drilling is done. This construction yard is surrounded by an eight-foot chain-link fence topped with barbed wire. Outside this fenced site there are office trailers and a diesel generator and transformer.

Citizens against the project planned a demonstration for September 7, 1981 (Labor Day). Roger Dintamin, the project manager employed by the Department of Energy (DOE), knew about the planned demonstration. Most indications were that the demonstration would be non-violent.

Normally, it was possible to drive up to the gate on the fenced construction site. However, the DOE, preparing for the demonstration, placed "No Trespassing" signs and a sawhorse barricade on the road to the work yard. On the day of the demonstration about forty law enforcement officers were to man the barricade. These officers consisted of DOE security men, sheriff's officers, and New Mexico State Police. This barricade was within the WIPP site, but located about 800 feet from the fenced construction yard. A parking area was provided for the demonstrators outside the barricade. Access to the WIPP site was allowed except for the barricaded area. Mr. Dintamin testified that "one of the stated purposes of this group was to stop construction," and that, concerning the construction yard and the buffer zone, "this was the area we wanted to protect." Mr. Dintamin stated that he viewed the demonstration as a "possible threat." He testified that by creating the buffer zone his objectives were to protect the people working in the construction yard and the property and equipment in the yard. He said he did not want the operation, a costly one, to be shut down. Further, on September 4, 1981, the defendant was interviewed by Nolan Hester. The following appears in the record:

> Q. And it is true, is it not, that you told this reporter [Hester] that the group planned to block the roads into the site on Labor Day and, as a result, disrupt the drilling now underway?
>
> [The defendant:] I can't remember the exact words, but that was the message.

The day before the demonstration Mr. Dintamin held a meeting with the local media. At this meeting Dintamin explained the precautions that had been taken, told the media that the barricaded area was posted, and told them that there were no exceptions. The defendant was not at this meeting.

On September 7, 1981, about 150 demonstrators entered the WIPP site and gathered at the parking area. Then they walked down the road to the barricade. They sang songs and held hands. Nothing suggested any violence. When they came to the barricade a loudspeaker warning was repeatedly given. There is ample evidence that the demonstrators were warned not to cross the barricade or they would be arrested for trespassing. There is also evidence that the defendant heard the warning. In fact, on appeal the defendant admits he crossed the barricade and that he heard the warnings, but argues that he did not have the required intent, and that he had a First Amendment right to cross into the restricted zone.

Some of the demonstrators and media people crossed the barricade. Most of the demonstrators did not cross. Mr. Dintamin stated that twenty-nine people were arrested so he assumed that is how many crossed. No arrests were made at the barricade. Sergeant Holder of the New Mexico State Police testified that no arrests were made at the barricade because of the possibility of a confrontation with 150 people. The demonstrators who did cross were allowed to walk up the road toward the construction yard. The defendant was following the demonstrators, off to the side, and taking pictures. He was arrested well beyond the barricade.

Other facts will be discussed where appropriate.

**1. Intent.**

Defendant contends that proof of intent is insufficient to support his criminal trespass conviction because he did not believe the warnings applied to the press.

■ Formerly, the criminal trespass statute required "malicious intent." *See,* § 30–14–1; *State v. Ruiz,* 94 N.M. 771, 617 P.2d 160 (Ct.App.1980). In 1981 the Legislature removed the "malicious intent" requirement. 1981 N.M.Laws, ch. 34, § 1;

*see also,* § 30–14–1. In so doing, the intent required by Section 30–14–1 became general criminal intent.

■■■ Our Supreme Court has adopted Uniform Jury Instructions. We have no authority to overrule instructions approved by the Supreme Court. *State v. Sheets,* 94 N.M. 356, 610 P.2d 760 (Ct.App.), *cert. denied,* 94 N.M. 675, 615 P.2d 992 (1980). NMSA 1978, UJI Crim. 16.70 (Repl.Pamp. 1982) states the essential elements of criminal trespass: that the defendant entered or remained without authorization or permission, knowing that consent to enter had been denied or withdrawn. NMSA 1978, UJI Crim. 1.50 (Repl.Pamp.1982) defines general criminal intent and must be used for every crime except those crimes not requiring criminal intent and first degree murder. *See* Use Note to UJI Crim. 1.50. UJI Crim. 1.50 states:

> [T]he state must prove to your satisfaction beyond a reasonable doubt that the defendant acted intentionally when he committed the crime. A person acts intentionally when he purposely does an act which the law declares to be a crime, [even though he may not know that his act is unlawful].

The Use Note to UJI Crim. 1.50 states that the bracketed language is to be used only if applicable. The bracketed language embodies the general rule that, for a general intent crime, ignorance of the law is no defense. *See* W. LaFave and A. Scott, *Criminal Law,* § 47 (1972) at 363. It applies here because the defendant claims he did not know he was violating the law.

■■ In this case the State was required to show that the defendant purposely did the act declared to be a crime—entering land without authorization knowing that consent to enter was denied. Viewed in the light most favorable to the verdict, *State v. Lankford,* 92 N.M. 1, 582 P.2d 378 (1978), the evidence establishes the required intent. The defendant purposely entered the barricaded area even after he had heard the warnings. This meets the requirement of UJI Crim. 16.70, which makes knowledge that consent to enter is denied an element of criminal trespass.

2. The First Amendment.

The defendant contends that as applied the criminal trespass statute is unconstitutional because it impermissibly abridges the First Amendment. First, he argues that it infringes on the right of the public generally to peaceably assemble. Second, he argues that as a newsman it infringes on his right to gather and report news.

■■ Concerning the right to peaceably assemble, it has never been held that this includes the right to peaceably assemble anytime, anywhere. *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). In examining restrictions on the right to assemble the Supreme Court has used an analysis based on the place of assembly: is it a traditional public forum? *Adderley v. Florida; Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *U.S. Postal Service v. Greenburgh Civic Assns.,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

■■■ The defendant argues that the WIPP site "was a unique locus for an assembly to petition the government to modify its nuclear policies." However, the test is not whether the place is appropriate considering the demonstration, but whether the character of the place is appropriate for the expression of views and ideas generally. The jail grounds in *Adderley* may have been an appropriate place to assemble to protest the arrest of students, racial segregation, and segregation at the jail, but that did not make it a public forum. The defendant has also argued that because on any day other than September 7, the public was free to drive right up to the construction yard, that somehow transforms it into a public forum. The fact that the public is generally allowed access does not transform a place owned or operated by the Government into a public forum. *Greer; Adderley.*

■■■ Streets and parks are traditional public forums. *See Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

The WIPP site, a construction site located in a remote area, is more similar to the jail considered in *Adderley*, the military base considered in *Greer*, and the letter boxes considered in *Greenburgh*. In examining restrictions on these government institutions, the Supreme Court has held that the government may exclude peaceful assembly *or access* which interferes with the function of the institution. In this context, the restriction need only be reasonable and content-neutral. *Adderley; Greer; Greenburgh*. This is the test to be applied here.

The DOE's restriction, a barricaded buffer zone extending 750–800 feet from the construction yard, was reasonable. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer; Adderley*. There was ample evidence that the purpose of the restriction was to protect the people working in the construction, the property and equipment located there, and to avoid a shutdown of the costly project. We do not believe the Constitution required the DOE to allow the demonstrators to congregate in the construction yard, or next to the construction yard fence. Further, in imposing the protective restriction, the DOE was not required to show that it expected violence. *Adderley* holds that the government may, in non-public forum situations, reasonably limit peaceful assembly.

The record clearly supports a conclusion that the restriction was content-neutral. The overwhelming weight of the evidence was that the DOE was protecting its project against the possibility of a shutdown, not that it intended to regulate what would be said at the assembly.

The defendant also contends that as a member of the press his arrest and conviction for criminal trespass offends the First Amendment. He argues that his right to gather news was impermissibly abridged. The trial court ruled that the defendant was a member of the press and we accept that finding.

There can be no doubt that freedom of the press is extremely important and necessary in our democratic form of government. Freedom of the press necessarily involves two things, acquisition of information and dissemination of information. *See* Note, 87 *The Rights of The Public And the Press To Gather Information*, Harv.L.Rev. 1505 (1974). Freedom of the press is a very broad concept, and we point out that in this case we are dealing with a narrow issue: the right of access by the press to an area controlled by the government and closed to the public generally, for the purpose of gathering information. We have already concluded that the exclusion of the public from the buffer zone was constitutional.

The defendant's argument is that the First Amendment requires that members of the press be given special access to areas, controlled by the government, and legitimately closed to the public. The Supreme Court has rejected this argument. In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), members of the press sought to strike down, on First Amendment grounds, a California Department of Corrections Manual provision which provided that " '[p]ress and other media interviews with specific individual inmates will not be permitted.' " In holding that the First Amendment does not require that members of the press have a special right of access to gather information, above and beyond that of the public generally, the court examined the governmental interest behind the regulation and the right of access allowed to the prison. While recognizing that there was necessarily a decreased flow of information the court, quoting *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), noted that " '[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.' " The court also noted that the regulation was not part of an attempt to conceal conditions in the prison or to frustrate the ability of the press to report those conditions. *Pell* was followed in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94

S.Ct. 2811, 41 L.Ed.2d 514 (1974) and *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978).

The defendant relies on *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), specifically relying on this language: "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." 448 U.S. at 575, 100 S.Ct. at 2826. We are not persuaded by this argument. First, *Richmond Newspapers* held that the press could not be excluded from a criminal trial. In *Richmond Newspapers* the court based its holding on the fact that criminal trials have historically been open to the public. In this case we deal with a government construction site, clearly a different situation. Second, as discussed in *Zemel v. Rusk*, many actions may decrease data flow to the public, but that does not mean that they violate the First Amendment. "For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right." 381 U.S. at 17, 85 S.Ct. at 1281.

Relying on *Pell, Saxbe,* and *Houchins,* we hold that, under the circumstances in this case, the defendant, as a member of the press, had no greater right than the public generally to cross the barricade. *See also State ex rel. Bingaman v. Brennan,* 98 N.M. 109, 654 P.2d 982 (1982). As we have discussed, the DOE's restriction was aimed at protecting its operation, not at concealing conditions there. There was evidence that the defendant requested, received permission to and did tour the site, including the construction yard, the week before the demonstration. The evidence was undisputed that this film was preserved, and his photos are before us as exhibits. The defendant has argued that a photographer employed by the DOE was allowed into the barricaded area, and that this constituted an attempt to present only the DOE's version of the demonstration. However, the evidence amply supports a conclusion that the DOE was protecting its operation, rather than frustrating the right of the press to obtain news.

Finding no merit to the defendant's constitutional claims we affirm his conviction for criminal trespass.

IT IS SO ORDERED.

DONNELLY, C.J., and HENDLEY, J., concur.