The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

Wendy Anne **BERGEN**, Defendant–Appellant.

No. 91CA1629.

Colorado Court of Appeals, Div. III.

April 21, 1994.

Rehearing Denied June 2, 1994.

Certiorari Denied Nov. 15, 1994.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Robert M. Russel, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Haddon, Morgan & Foreman, P.C., Lee D. Foreman, Rachel A. Bellis, Denver, for defendant-appellant.

Opinion by Judge DAVIDSON.

Defendant, Wendy Anne Bergen, appeals from the judgments of conviction entered upon jury verdicts finding her guilty of dogfighting, conspiracy to commit dogfighting, and accessory to dogfighting. We affirm.

Defendant was an investigative reporter with the news department of a Denver television station. In 1989, Denver passed an ordinance disallowing ownership of pitbull terriers, known as "pitbulls," a breed commonly used as fighting dogs. Shortly after the ordinance was enacted, defendant began work on a feature story concerning dogfighting in Colorado.

The evidence presented at defendant's trial established the following events. In search of the opportunity to videotape an actual Colorado dogfight, defendant contacted Humane Society officials and was told they could not help her contact any known Colorado dogfighters or provide her with any film of dogfights which had taken place in Colorado. Defendant was then informed by a friend, Mark Labriola, that he could arrange, for her to attend a dogfight because he was in contact with pitbull owners.

Labriola learned of a person living in California who could help him get access to a dogfight. Labriola wired $50, provided by defendant, to this person in California and was given the name of Phil Walker, who bred and raised pitbulls in Lakewood, Colorado.

On September 21, 1989, defendant, accompanied by two cameramen, met Walker and Labriola at a restaurant and followed them to a parking lot along the South Platte River bike path in Sheridan, Colorado. Walker and Labriola had one pitbull in the car with them. Another pitbull was transported in a truck driven by a friend of Labriola and accompanied by a friend of Walker.

The cameramen filmed Walker making a grandiose statement regarding his status as a dogfighter. Labriola and Walker were then equipped with wireless microphones. Each of them took one of the pitbulls, and the entire party moved to a secluded spot near the river and away from the road. There, the pitbulls were released and allowed to fight each other, while both of the cameramen took videotape. Defendant, Labriola's friend and Walker's friend, along with Labriola and Walker, comprised the entire audience for the dogfight.

Within a minute, the larger of the two dogs had his jaws firmly clamped around the other dog's head. Walker then stopped the fight by forcing a screwdriver between the dog's back teeth to unlock the jaws.

Labriola opened his wallet for the camera and flashed several large bills implying some money had been lost and stating, "That's history." Defendant interviewed Walker on camera. Then defendant and the cameramen returned to the station.

Defendant and Labriola next contacted Walker for help in obtaining some videotape of fighting pitbulls in training. On October 11, 1989, defendant and one of her cameramen met with Walker to film a training fight in which the pitbulls were to be muzzled. Walker brought the same two pitbulls but did not have any muzzles. Defendant provided the money for the purchase of two muzzles at a pet supply store.

At a park in Lakewood, the dogs were muzzled and then, again, released to fight each other while the cameraman videotaped the event. The dogs fought for several minutes until one dog managed to get his mouth partially out of its muzzle, and the fight was stopped. One of the dogs was then transported back to Walker's house in a station owned vehicle.

Defendant also wanted to videotape pitbulls training on a treadmill. In the basement of one cameraman's home, defendant had the other cameraman videotape one of Walker's dogs on a treadmill. Another pitbull was held up to provide "encouragement" to run faster.

Defendant then was informed that attending a dogfight was illegal in Colorado. In a meeting with the Arapahoe district attorney and a fellow reporter, defendant asked if she or the station would be prosecuted for broadcasting a dogfight in connection with her story on pitbull fighting. Defendant was told that there would be no guarantee that she would not be prosecuted should she use a tape of a fight she had attended. Defendant then asked to go "off the record" and told the district attorney that she had been present at a sparsely attended dogfight in a basement in Sheridan.

Upon hearing that defendant had not been granted carte blanche to broadcast a dogfight videotape, her supervisors removed the story from the programming line up for the fall ratings period. One of defendant's cameramen, with the cooperation of Labriola, then attempted to videotape another fight without defendant's presence. Labriola took one of Walker's pitbulls and set it loose to fight with another pitbull. Videotape of this attempted, but largely unsuccessful, fight was not satisfactory for use by defendant as fight footage.

Although the story had been shelved, defendant did not abandon the idea. In a memorandum to her supervisors she advised them that she would be receiving an anonymous tape in the mail which would allow her to revive the pitbull story without breaking any laws. She predicted the resulting series would be a ratings success.

Defendant then took the videotape of the September fight and copied it to home video format. She copied and re-copied the tape several times to give it a more amateurish appearance. She wrote an anonymous letter to herself and inserted it and the tape into packaging in which she had recently received a tape for an unrelated story and claimed it had been received in the mail.

This videotape was incorporated into a four part series entitled "Blood Sport" which aired in the 10:00 p.m. newscasts during the spring 1990 ratings period. Also included was the treadmill sequence, the muzzled fight, and the attempted fight, which was represented to be a training method called a "roll."

Defendant explained on camera that the unmuzzled dogfight footage was sent to the station anonymously. Videotaped statements by Walker and Labriola were shown, with faces obscured and voices distorted, including Walker's braggadocio and Labriola's wallet scene. Also included were interviews with an investigator for a humane organization, videotape of non-fighting, family pet pitbulls and their owners, and pictures of persons who had been injured or maimed by pitbulls.

The broadcast of the series was greeted by a public uproar. Denver newspapers and other television stations reported that the dogfights had been set up and filmed solely for the purpose of the series. Defendant and her cameramen agreed to maintain the story that the videotape of the unmuzzled dogfight had been sent to the station anonymously.

When Arapahoe and Jefferson county law enforcement officials began an investigation, Labriola agreed to provide information in exchange for immunity. Several conversations between Labriola and defendant were recorded without defendant's knowledge during which the fabricated "anonymous videotape" story was discussed.

The Jefferson County district attorney's office brought the matter before a grand jury in June 1990. At that time, defendant and her cameramen received grand jury subpoenas. Although these subpoenas were later cancelled, and all three were released from

any obligation to appear, they voluntarily agreed to testify. At their first appearances, all three testified that the tape was received anonymously. Later all three re-testified and admitted that the previous testimony had been untrue.

Defendant and the cameramen were charged with dogfighting and perjury. Walker was charged with dogfighting. The cameramen and Walker accepted plea agreements prior to trial. Defendant went to trial on eleven dogfighting and perjury related charges, and was convicted of the dogfighting charges here at issue.

## I.

Defendant first contends that she was not properly advised of her rights as required by the Colorado grand jury statute, § 16–5–204, C.R.S. (1986 Repl.Vol. 8A). Thus, she asserts, prosecution of the dogfighting related offenses was prohibited. We disagree.

According to § 16–5–204(4)(a), C.R.S. (1986 Repl.Vol. 8A):

At the option of the prosecuting attorney, a grand jury subpoena may contain an advisement of rights. If the prosecuting attorney determines that an advisement is necessary, the grand jury subpoena shall contain [the advisement] prominently displayed on the front of the subpoena.

Section 16–5–204(4)(b), C.R.S. (1986 Repl. Vol. 8A) provides that:

Any witness who is not advised of his rights pursuant to paragraph (a) of this subsection (4) shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he testifies or any evidence he produces, nor shall any such testimony or evidence be used as evidence in any criminal proceeding, except for perjury, against him in any court.

Here, the grand jury initially issued to defendant a subpoena bearing an advisement of rights. After she requested an opportunity to examine her own previous statements in the possession of the prosecution pursuant to § 16–5–204(4)(h), C.R.S. (1986 Repl.Vol. 8A), however, she was notified that the subpoena had been cancelled but that she could still appear before the grand jury to explain her involvement if she chose to do so, and that an indictment might issue against her as a result of the investigation.

As the trial court found, after her subpoena was cancelled, defendant was under no compulsion to testify. By cancelling the subpoena, the prosecutor took the risk that she would not appear, and he could not have compelled her to do so without reissuing a subpoena. Defendant chose, however, to appear before the grand jury. By testifying on her own volition, she became a voluntary witness.

Nonetheless defendant argues that, because her subpoena was cancelled, she received no advisement and, therefore, could not be prosecuted for the dogfighting related charges. She claims she was deprived of her right to a subpoena bearing a written advisement pursuant to § 16–5–204(4)(b). Because we hold that §§ 16–5–204(4)(a) and 16–5–204(4)(b) do not apply to non-subpoenaed, voluntary witnesses, we disagree.

## A.

■ Contending that § 16–5–204(4)(b) reflects a legislative intent to bar prosecution of a grand jury witness who does not receive an advance written advisement, defendant asserts that the term "any witness" must be interpreted to refer to all witnesses testifying before the grand jury who have not received an advance written advisement. A witness appearing without advance written advisement, even if not subpoenaed, she argues, is protected from prosecution by operation of the statute. We disagree.

■ The interpretation of a statute is a question of law. *Colorado Division of Employment & Training v. Parkview Episcopal Hospital,* 725 P.2d 787 (Colo.1986). Interpretations must reflect legislative intent. *See People v. Terry,* 791 P.2d 374 (Colo.1990). "Courts look first and foremost to the language of the statute itself to discern legislative intent." *Martinez v. Badis,* 842 P.2d 245, 249 (Colo.1992).

■ Also, courts must look at the context in which statutory terms appear. *State v.*

*Hartsough,* 790 P.2d 836 (Colo.1990). In order sensibly to effect the legislative intent embodied in an entire statutory scheme, statutes must be construed as a whole. *In re Organization of Upper Bear Creek Sanitation District,* 682 P.2d 61 (Colo.App.1983); *see also Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1976). Therefore, § 16–5–204(4)(b) must be read and considered in the proper context of the full statute. *See Allen v. Charnes,* 674 P.2d 378 (Colo.1984).

Defendant argues that the term "any witness" as used in § 16–5–204(4)(b) is ambiguous and must be interpreted in light of its legislative history. We do not agree. The scope of this term can be resolved by the statutory language itself.

Section 16–5–204(4)(b) specifically refers to any witness not advised pursuant to § 16–5–204(4)(a), which section refers only to an advisement appearing upon a subpoena. Reading the two subsections together compels us to conclude that, because of the specific reference in § 16–5–204(4)(b) to § 16–5–204(4)(a), the term "any witness" means any subpoenaed witness who did not receive a written advisement upon the subpoena. *See State v. Hartsough, supra; Sheely v. People,* 54 Colo. 136, 129 P. 201 (1913) (the meaning of a doubtful word may be discerned from the words around it).

Thus, we have little difficulty determining that, by its plain language, the statute provides a bar to prosecution of subpoenaed, but unadvised, witnesses. Voluntary witnesses, in contrast, do not receive a subpoena; therefore, the advisement requirement of § 16–5–204(4)(a) has no application to them.

■ Furthermore, we agree with the People that we must construe a statute to avoid an illogical result. *See People v. Silvola,* 190 Colo. 363, 547 P.2d 1283 (1976) *overruled in part on other grounds, People v. Macrander,* 828 P.2d 234 (Colo.1992). We note that only advance written notice satisfies the statutory requirement; a verbal advisement does not suffice. *People ex rel. Gallagher v. District Court,* 198 Colo. 468, 601 P.2d 1380 (1979). However, § 16–5–204(4)(a) gives the prosecutor only two choices: to issue a subpoena containing a written advisement or to issue one without a written advisement. It contains no provision for any other method of providing an advance written advisement. Accordingly, defendant's interpretation would require the conclusion that the statutory bar to prosecution implicitly must extend to a witness who appears without the compulsion of a subpoena. This is illogical.

By their terms, §§ 16–5–204(4)(a) and 16–5–204(4)(b) set forth a requirement which is applicable only if a witness is compelled to testify pursuant to a subpoena. This portion of the statute is silent as to the need for an advance written advisement, or the consequences of the absence of one, under any other circumstances. *Cf.* § 16–5–204(4)(*l*), C.R.S. (1986 Repl.Vol. 8A) (procedures applicable when a witness requests to testify or retestify before the grand jury and such request is denied).

These provisions simply do not speak to, and are inapplicable to the rights of any witness who voluntarily appears before the grand jury without compulsion of a subpoena. The statute unambiguously states only that, if a grand jury witness is compelled to testify pursuant to a subpoena, such witness cannot later be prosecuted if the subpoena did not set forth a proper advisement. In light of this plain language, we cannot add by implication words which are not there. Accordingly, contrary to defendant's argument, we will not infer any legislative intent to extend the statutory bar to prosecution of voluntary witnesses not appearing pursuant to subpoena.

### B.

■ Defendant argues, nonetheless, that, even if the right of an advance written advisement applies only to subpoenaed witnesses, witnesses such as she, who are the subject of a grand jury investigation and thus potential defendants, *must* be served with a subpoena bearing a written advisement. Despite the absence of any specific statutory language concerning "target" witnesses, she contends that the legislative history of § 16–5–204 indicates the General Assembly intended to protect "target" witnesses by requiring that they testify only pursuant to a subpoena

containing a written advisement. In other words, she contends that the right to an advance written advisement cannot be waived by the otherwise voluntary appearance of a "target" witness. We do not agree.

■ Statutory rights may be waived so long as the waiver is performed voluntarily. *See People v. Sevigny*, 679 P.2d 1070 (Colo. 1984). Our review of the pertinent legislative history reveals nothing which would lead to the conclusion that the right to service of a subpoena bearing an advance written advisement is not a statutory right subject to voluntary waiver.

The Colorado grand jury statute was revised in 1977. The legislative history reflects acknowledgment that a new, statutory right to written advisement for subpoenaed witnesses was being created. A verbal advisement prior to testimony remained sufficient to satisfy constitutional due process concerns. *See People v. Austin*, 159 Colo. 445, 448, 412 P.2d 425, 426 (1966) ("[T]he appearance and voluntary testimony by a potential defendant before a grand jury, after being fully advised both of his constitutional rights and that he is the subject of the investigation is not in violation of the privilege against self-incrimination. . . . To hold otherwise would be . . . to hold that one whose conduct is under investigation, may rush to the grand jury room, demand to be heard, *ignore all warnings,* and if he be permitted to open his mouth, he is thereby forever absolved of his offense." (emphasis in original)).

Testimony before the Senate Judiciary Committee indicates that the reformers wished to provide for an advance notification of rights by requiring the inclusion of an advisement upon grand jury subpoenas. Acknowledging the expansive power which the grand jury holds to compel a witness to testify by the use of the subpoena, legislative discussion and questioning centered around the advisability of providing the new statutory right to all subpoenaed witnesses or only to "target" subpoenaed witnesses. *See* Tape Recordings of Senate Judiciary Committee Hearings, 51st General Assembly, 1st Session (February 16 and March 17, 1977) (S.B. 186 Hearings).

In response to the proposed amendments, district attorneys and others testified that, in their opinion, providing the advance advisement on every subpoena in order to guarantee that "target" witnesses are adequately advised is an unnecessarily broad approach. The testimony indicates a concern that the advance notification would unnecessarily frighten "non-target" witnesses and send them scurrying for legal representation or provide uncooperative "non-target" witnesses with a method of impeding the grand jury process.

No opposition was presented to the proposition that subpoenaed "target" witnesses are entitled to advance advisement in order to secure effective employment of the right to counsel and right against self-incrimination. Although it was acknowledged that sometimes a witness could enter the grand jury room as a witness, but leave as a potential defendant, there was general agreement that "target" witnesses commonly are easily identified by prosecutors. It was further agreed that, if the prosecution was to be allowed a choice of including an advisement on a subpoena, then it should have to live with its initial choice. *See* S.B. 186 Hearings.

Thus, the legislative history discloses that serious concern for the protection of a subpoenaed "target" witness led to the creation of the right to a grand jury subpoena containing an advisement. There is, however, no indication that such "target" witness could not waive this new statutory right by a voluntary appearance.

In *People ex rel. Gallagher v. District Court, supra,* our supreme court considered the impact of the new statutory right to an advance written advisement upon a subpoena. A "target" witness appeared before the grand jury pursuant to directions issued by a grand jury investigator who informed him that a subpoena had been issued. The subpoena was never served upon the witness. The court determined that: "The [trial] court specifically found that [the witness] did not appear voluntarily. . . . Thus, there was no waiver of the statutorily required service of a subpoena containing an advisement of rights." *People ex rel. Gallagher v. District*

*Court, supra,* 198 Colo. at 471, 601 P.2d at 1383.

Although defendant urges us to infer from *Gallagher* that this statutory right cannot be waived, we decline to do so. *Gallagher* does not hold that the right cannot be waived; it merely holds that it was not waived under the circumstances there present. Hence, we conclude that *People ex rel. Gallagher v. District Court, supra,* interprets the "target" witness' statutory right to advance written advisement upon a subpoena as one which may be waived by a voluntary appearance.

▆▆▆Here, there is no controversy as to whether defendant was such a "target" witness. Defendant initially was served with a subpoena bearing an advisement. If she possessed any doubt that she was a "target," she was so informed in the letter notifying her that the subpoena had been cancelled because she was told therein that an indictment could issue against her as a result of the investigation.

Defendant chose to appear and to testify before the grand jury despite the fact that the subpoena had been cancelled. On this basis, and with record support, the trial court made a factual finding that defendant appeared voluntarily and testified by choice.

After cancellation of her subpoena, defendant had the option to appear, although she was not compelled to do so, or to decline to appear unless, or until, the prosecution reissued a subpoena. The record also reflects that defendant was verbally advised of her rights prior to her testimony at each appearance before the grand jury, and she does not argue that this was insufficient to protect her constitutional rights. Therefore, the trial court's finding that defendant, although clearly a "target," could and did waive her statutory right to service of an advisement-containing subpoena by voluntarily appearing before the grand jury is supported by the record and cannot be overturned on review.

## C.

▆▆▆Alternatively, defendant contends that, even if the provisions of §§ 16–5–204(4)(a) and 16–5–204(4)(b) do not apply to voluntary witnesses, her subpoena was deliberately cancelled for the purpose of preventing her from viewing, pursuant to § 16–5–204(4)(h), prior statements in the possession of the prosecution. Thus, she argues, by this prosecutorial misconduct, her appearance before the grand jury was rendered involuntary, and the right to advance written advisement was triggered. We do not agree.

Simply stated, we do not categorize the decision to cancel her subpoena, even if to avoid giving her the prior statements, as prosecutorial misconduct. She was informed that the subpoena had been cancelled. She was informed that she could still appear and explain her involvement. She was informed that an indictment could issue against her. All of this information was correct. Therefore, we conclude that the record supports the trial court's finding that defendant testified voluntarily, and we will not disturb that finding on appeal. *See People v. Corley,* 698 P.2d 1336 (Colo.1985).

Defendant's reliance upon *People ex rel. Gallagher v. District Court, supra,* is misplaced. The witness in that case appeared pursuant to notification by a grand jury investigator that he had been subpoenaed to testify. The court found that although the subpoena had not actually issued, his appearance was nonetheless involuntary. Although defendant here may have deemed it necessary to appear, such would have been a personal decision, quite distinct from a misapprehension that she was under subpoena to appear.

## D.

▆▆▆Similarly, we disagree with defendant's contentions that she was denied her statutory right to view her prior statements. As the trial court found, the right to examine prior statements belongs only to summoned witnesses. *See* § 16–5–204(4)(h). After the subpoena was cancelled, defendant no longer was a summoned witness and did not have a right to examine those statements.

The right to view prior statements was included in the statutory reforms to protect summoned witnesses from deliberate "perjury" traps. *See* S.B. 186 Hearings. Here, as we have discussed, defendant was under no

compulsion to testify and because of that, the prosecution was under no statutory obligation to allow her to view her prior statements. Whether the reason for the cancellation was to avoid providing the statements to her is not relevant to her status as a voluntary witness.

## II.

█ Defendant also argues that her constitutional right to effective assistance of counsel was violated as a result of the prosecution's use of Labriola as an informant. Specifically, defendant contends that, because she was represented by an attorney, any contact with her initiated by Labriola in his capacity as a prosecution informant was improper. We disagree.

█ The Sixth Amendment right to effective assistance of counsel has not been found to attach when a person appears before a grand jury, even if that person is a subject of the investigation. *See United States v. Williams,* 504 U.S. ——, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *In re Special September 1978 Grand Jury,* 640 F.2d 49 (7th Cir.1980). Hence, the right to counsel during grand jury proceedings is purely statutory; therefore, constitutional effective assistance of counsel standards are not implicated. *See Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). And, under the federal system the prohibition against communications with a party known to be represented by an attorney is not violated by use of an undercover informant prior to the filing of formal charges. *United States v. Ryans,* 903 F.2d 731 (10th Cir.1990); *cf. People v. Hyun Soo Son,* 723 P.2d 1337 (Colo.1986) (Sixth Amendment right to counsel attaches after charges are pending not when a person becomes a suspect or a focal point of an investigation).

█ Pursuant to the Colorado grand jury statute, the right to counsel is limited to the presence and advice of counsel during questioning and, therefore, differs from the right to be represented by counsel during trial. *See* S.B. 186 Hearings. Defendant's counsel was present and advised her throughout the grand jury questioning. Therefore, we perceive no deprivation of her statutory right to counsel relative to her communications with Labriola.

To the extent that defendant argues that the inability to review her previous statements or that the pleas by Labriola to misinform the grand jury in order to protect him rendered the assistance provided by her attorney ineffective, we simply note that defendant was under no compulsion to testify at all and was under no obligation to heed any entreaties by her former cohort to testify falsely.

## III.

█ Defendant next asserts that the prosecution elicited and used previously immunized information during the grand jury proceedings and that dismissal of the entire indictment is therefore warranted. We disagree.

█ The People concede that defendant was granted an informal promise of immunity by the Arapahoe County district attorney as to the use of her "off the record" statements. Violation of such an informal agreement implicates the principles of due process and fundamental fairness. *People v. Fisher,* 657 P.2d 922 (Colo.1983).

The trial court went further however, and found that formal immunity had been granted and that the use of these immunized statements was directly connected to count one of the indictment and dismissed that count, although all other counts were supported by overwhelming independent evidence.

Here, the record reflects that defendant approached the Arapahoe County district attorney's office and inquired as to whether attending and videotaping a dogfight would be a crime. After she was informed that it would be, defendant asked to go "off the record" and revealed that she had already attended a dogfight. Although a deputy district attorney present at the conversation indicated that he believed a grant of use immunity had been given as to those statements, no formal order of immunity was ever entered by any trial court.

At best, therefore, this represents a grant of "informal immunity," not formal statutory immunity. *See People v. Briggs,* 709 P.2d 911 (Colo.1985) (Informal immunity, in the form of a promise not to prosecute, must be enforced upon due process, equitable, or contract principles.).

The record of the grand jury hearings indicates that defendant testified concerning this dogfight and about her contact with the Arapahoe County district attorney's office. The record also reveals that information concerning this dogfight, as well as the other dogfighting incidents, came to the attention of law enforcement from numerous other witnesses and sources.

Although we do not agree that this record supports the trial court's determination that formal immunity had been granted or that there was insufficient evidence beyond the purportedly immunized statements to support probable cause on count one of the indictment, the record amply supports the trial court's evidentiary finding that the remaining counts of the indictment were supported by sufficient independent evidence, and this ruling will, therefore, not be disturbed on appeal. *See People v. Fish,* 660 P.2d 505 (Colo.1983).

To the extent that defendant argues that the immunized statements were used indirectly in the investigation, we agree with the trial court's finding that the information provided by defendant in the immunized statements was lacking in detail, and the danger of its being used to influence the direction of the investigation or to refresh or expand the recollection of any witnesses was so minimal as to preclude such use beyond a reasonable doubt.

### IV.

■ Defendant alleges that prosecutors spoke with grand jurors off the record, invited grand jurors to prosecution offices for irregular meetings, screened grand jury questions, and corrected transcripts of the grand jury proceedings without consent from the court. She urges us to utilize this court's supervisory powers to dismiss the indictment because of this prosecutorial misconduct.

We conclude that a supervisory power of this court to sanction prosecutorial misconduct by ordering the dismissal of an indictment is uncertain. We further conclude that, even were such supervisory power available for that purpose, dismissal of the indictment would not be warranted here.

The procedures used here were irregular under § 16–5–204(4)(f), C.R.S. (1986 Repl. Vol. 8A), and Crim.P. 6.4, which provide that all grand jury proceedings must be recorded and that all transcripts must be sealed and filed with the court. For this reason we agree that the actions complained of violated the rule and statute and are not to be condoned. However, defendant's contentions notwithstanding, we do not agree that these irregularities in grand jury procedure, combined with the deliberate cancellation of her subpoena and the use of Labriola as an informant, constitute outrageous government conduct which justifies dismissal.

This court has dismissed a criminal action in which it was determined that the behavior of government agents was so outrageous as to violate fundamental fairness and to shock the universal sense of justice. *People v. Auld,* 815 P.2d 956 (Colo.App.1991); *see also Bailey v. People,* 630 P.2d 1062 (Colo.1981) (implicitly recognizing that a claim of deprivation of due process may result from outrageous government conduct); *People v. Aponte,* 867 P.2d 183 (Colo.App.1993).

■ However, as a statutory court, this court does not possess general powers of supervision over lower courts, or attorneys appearing therein, except for the ability to issue "any writs, directives, orders, and mandates necessary to the determination of cases within its jurisdiction." Section 13–4–102(3), C.R.S. (1987 Repl.Vol. 6A); *cf.* Colo. Const. art. VI, § 2(1) ("The supreme court ... shall have a general superintending control over all inferior courts, under such regulations and limitations as may be prescribed by law."); *and* C.R.C.P. 241.1(b) ("Every lawyer licensed to practice law in the State of Colorado is subject to the disciplinary and disability jurisdiction of the Supreme Court in all matters relating to the practice of law."). Therefore, our review is limited to whether the trial court properly refused to dismiss

the indictment. *See People v. Armstrong,* 664 P.2d 713 (Colo.App.1982), *rev'd on other grounds* 701 P.2d 17 (Colo.1985); *cf. Gold Rush Investments v. Ferrell,* 778 P.2d 297 (Colo.App.1989).

■ Prosecutorial misconduct during grand jury proceedings can result in dismissal if actual prejudice accrues to the defendant or the misconduct compromises the structural integrity of the grand jury proceedings to such a degree as to allow for the presumption of prejudice. *People v. Rickard,* 761 P.2d 188 (Colo.1988); *cf. Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (in federal system, supervisory powers may not be invoked to circumvent the harmless error analysis prescribed by Fed.R.Crim.P. 52(a); before an indictment may be dismissed because of prosecutorial misconduct, prejudice to the defendant must be shown); *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (harmless error analysis applies to defects or irregularities in the grand jury process).

Here, after reviewing the grand jury hearing transcripts and affidavits submitted by the court reporter and the deputy district attorneys involved, the trial court found that these procedural defects could not have affected the decision by the grand jury to return an indictment and that there was, therefore, no resulting prejudice to defendant. Neither did the trial court find that these irregularities were so extreme as to compromise the integrity of the grand jury investigation to such a degree that they violated defendant's right to a fundamentally fair proceeding.

The grand jurors were sworn to render a determination as to probable cause based upon the investigation and without regard to malice, ill will, fear, or favoritism. *See* § 13–72–105, C.R.S. (1987 Repl.Vol. 6A). Our review of the sealed grand jury records and the affidavits shows support for the trial court's determination that they did exactly that; therefore, we decline to disturb it on appeal. *See People v. Tynan,* 701 P.2d 80 (Colo.App. 1984).

The trial court found that any improper conduct by the district attorneys which might have taken place during unrecorded proceedings could not have influenced the grand jury's determination because of the strength of the evidence which was properly presented. The trial court also found that the changes which the district attorneys ordered to the transcripts after the indictment was returned were, in fact, minor corrections that were not material to the substance of, and did not change the meaning of, any testimony. Therefore, the trial court concluded that the inappropriate actions of the district attorneys had not so undermined the integrity of the judicial process as to allow a presumption that defendant's due process rights had been violated.

The record of the grand jury proceedings also indicates that, while the district attorneys may have screened some questions, the grand jurors were given the opportunity to question, and did question, most witnesses in addition to examination by the district attorneys. Thus, we agree with the trial court that the irregularities here were harmless. *See People v. Rickard, supra.*

Not only has defendant failed to prove prejudice because of the grand jury irregularities, as we have determined, she also has failed to demonstrate that any prosecutorial misconduct occurred which affected her constitutional rights to due process. Accordingly, dismissal of the indictment was not warranted.

■ Furthermore, we reject defendant's argument that she is entitled to an evidentiary hearing in which she may call the court reporter and the grand jurors to establish prejudice. The trial court reviewed the materials submitted in support of, and in opposition to, defendant's motion to dismiss the indictment for prosecutorial misconduct and found that, no matter what the prosecuting attorneys had done during the unrecorded proceedings or the off the record meetings, no reasonable grand jury could have failed to return an indictment based upon the evidence which was presented during the recorded proceedings. Based upon this finding, the trial court declined to allow an evidentiary hearing on the matter.

544

We perceive no abuse of the trial court's discretion in refusing to hold an evidentiary hearing. *See People v. District Court,* 619 P.2d 774 (Colo.1980); *People v. Heller,* 698 P.2d 1357 (Colo.App.1984), *rev'd on other grounds,* 712 P.2d 1023 (Colo.1986).

■ We further note that a trial court may determine motions testing the validity of an indictment upon grounds other than lack of probable cause based only upon the grand jury record and argument of counsel, unless cause is shown for the need for additional evidence. Section 16–5–204(4)(n), C.R.S. (1986 Repl.Vol. 8A). Although grand jury secrecy is not absolute, breaching that secrecy by requiring testimony from grand jurors concerning the basis for their decision to return an indictment would be countenanced only upon a compelling need that would overcome the policy of secrecy. *See People v. Tynan, supra.*

While we do not condone the lapses of proper procedure in which the district attorneys here indulged, absent a showing that the inappropriate conduct may have affected the validity of the indictment, the trial court was under no obligation to breach grand jury secrecy and to conduct such a hearing. *See People v. District Court,* 199 Colo. 398, 610 P.2d 490 (1980) (grand jury secrecy should not be breached based upon only speculation that improper conduct by the district attorney occurred); *see also People v. Rickard, supra* (disclosure of grand jury proceedings must be made only upon a compelling need which outweighs the countervailing policy of secrecy).

## V.

■ Defendant argues that the dismissal of the first count of the indictment rendered the remainder of the indictment unconstitutionally vague. We disagree.

■ An indictment is not fatally vague if it sufficiently advises the defendant of the charges such that he or she may adequately defend against them. *People v. Gable,* 647 P.2d 246 (Colo.App.1982). And, the sufficiency of an indictment is measured by substance, not form. *People v. Ybarra,* 652 P.2d 182 (Colo.App.1982).

We conclude that the dismissal of count one, which included the factual statement, did not render the remainder of the indictment so vague as to provide defendant with insufficient information as to the charges. The factual statement did not contain any immunized information and to hold that it became nullified as to the other counts of the indictment would needlessly exalt form over substance.

## VI.

■ Defendant also argues that the news gathering activities of videotaping and reporting a dogfight are protected by the First Amendment and, alternatively, that attending a dogfight for the purposes of engaging in such activities cannot support a conviction for dogfighting under the statute because the necessary mental state is lacking. We disagree with both contentions.

## A.

Section 18–9–204, C.R.S. (1986 Repl.Vol. 8B) provides in pertinent part:

(1)(a) No person shall cause, sponsor, arrange, hold or encourage a fight between dogs for the purpose of monetary gain or entertainment.

(b) For the purposes of this section, a person encourages a fight between dogs for the purposes of monetary gain or entertainment if he:

(I) Is knowingly present at such a fight ...

■ Engaging in news gathering activities does not guarantee the press a constitutional right of special access to information that is not generally available to the public. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Nor does the First Amendment permit the press to engage in activities that are otherwise illegal for the purpose of reporting the news. *See State v. McCormick,* 101 N.M. 349, 682 P.2d 742 (N.M.App.1984) (First Amendment gives no greater right to press than to public to cross barricades into nuclear waste disposal project during activist demonstration); *Stahl v. State,* 665 P.2d 839 (Okla.Crim.App.1983)

(Press had no First Amendment right of access to nuclear generation site and news gathering function does not provide immunity from criminal trespass charges).

The dogfighting statute does not prohibit a news reporter from gathering or disseminating information about dogfighting. It simply prohibits attendance, by anyone, at any dogfight that is presented for profit or entertainment.

### B.

■■■ Neither do we agree with defendant's contention that the Colorado dogfighting statute only criminalizes attendance at a dogfight if the attendee is entertained or receives some monetary gain. We read the statute differently.

By its plain language, the statutory requirement that the fight be "for the purpose" of entertainment or monetary gain serves to distinguish this type of dogfight from the type of confrontation that happens unintentionally because of a chance encounter between two or more uncontrolled dogs. *See* § 18–9–204(1)(a), C.R.S. (1986 Repl.Vol. 8B). It serves to define a prohibited dogfight as one which takes place through purposeful actions by the dog's owners or handlers.

The statutory requirement that in order to encourage a dogfight a person must "knowingly" attend, serves to distinguish that sort of attendee from people who inadvertently find themselves at a dogfight, or from someone at the scene who is unaware that a dogfight is taking place. *See* § 18–9–204(1)(b)(I), C.R.S. (1986 Repl.Vol. 8B). There is no requirement in the statute that the attendee be at the scene for the purpose of fun or profit.

### C.

■■■ Defendant contends, however, that, unless a fun or profit state of mind is attributed to the attendee, the statute is constitutionally overbroad because it criminalizes mere presence at a dogfight. We do not agree.

The "knowing presence" requirement of the statute effectively protects those persons who might inadvertently find themselves at a dogfight. *Cf. Peck v. Dunn,* 574 P.2d 367 (Utah 1978) (sensible interpretation of ordinance forbidding spectators at animal fights is that such purposeful presence does not include innocent passersby); *see also State v. Abellano,* 50 Haw. 384, 441 P.2d 333 (1968) (statute forbidding mere presence at an animal fight is not sufficient to state with clarity the act proscribed); *State v. Wear,* 15 Ohio App.3d 77, 472 N.E.2d 778 (1984) (statute forbidding mere presence at an animal fight, as opposed to knowing presence, is insufficient to exclude an innocent passerby).

' As to any person who attends a dogfight knowingly, however, the plain language of the statute indicates that the General Assembly has determined that the presence of spectators at dogfights encourages dogfighting activity, whether such spectators are enthusiastic, neutral, or disgusted observers. A spectator is "one that looks on or beholds, especially one witnessing an exhibition," but is not necessarily a fan of the event witnessed. *See* Webster's Third New International Dictionary at 2188. And, prohibiting knowing presence of spectators at animal fights is consistent with the legislative purpose to prevent such fights because, without the "knowing presence" of spectators, much of the "sport" of the fights would be eliminated. *People v. Superior Court,* 247 Cal.Rptr. 647, 201 Cal.App.3d 1061 (1988). *Cf. State v. Tabor,* 678 S.W.2d 45 (Tenn.1984) (prohibition of knowing presence at animal fight is reasonably related to the discouragement of such fights).

Therefore, we conclude that the statutory prohibition against knowingly attending a dogfight held for profit or entertainment is constitutional. There is no need to attribute a more specific mental state to the attendee.

### VII.

■■■ Although defendant does not argue that the filmed confrontation upon which her convictions were based was not arranged for the purpose of entertainment or monetary gain, she contends that it was not a fight between dogs within the meaning of the statute because the dogs were muzzled. We disagree.

Former versions of the statute required that there be a contest or competition with the killing or mutilation of dogs as its ultimate aim. However, the present version requires only "a fight between dogs." *Compare* Colo.Sess.Laws 1981, ch. 212 at 976 *with* Colo.Sess.Laws 1985, ch. 156 at 678. The latter statute contains no requirement that dogs actually sustain injuries or that injuries are expected to occur. Therefore, we conclude that there is no significance to the fact that the dogs were muzzled. *See People v. Davis,* 794 P.2d 159 (Colo.1990) (when a statute is amended it is presumed that the legislature intended to effect a change in the law).

A review of the videotaped confrontation between the dogs shows that the two dogs were set loose to fight with each other and did so vigorously. But for the muzzles, the animals could well have inflicted and sustained injuries similar to those which occur during unmuzzled fights. The videotape also shows that one of the dogs was able to get his teeth outside the muzzle and that the fight was stopped at that point by the handlers. Under the circumstances, we reject defendant's contention that the muzzled confrontation was a mere demonstration, or "photo opportunity." The evidence was sufficient for the jury to conclude that the dogs were fighting each other in any ordinary sense of the word. *See Kogan v. People,* 756 P.2d 945 (Colo.1988).

The judgments are affirmed.

CRISWELL, J., concurs.

TAUBMAN, J., dissents.

Judge TAUBMAN dissenting.

Because I respectfully disagree with the majority's construction of the grand jury statute, its upholding the constitutionality of the dogfighting statute, and its assessment of prosecutorial misconduct, I dissent.

## I. Interpretation of the Grand Jury Statute

The majority concludes that Bergen waived her rights under the grand jury statute and thus was not entitled to the prosecutorial immunity it affords. I disagree with both that conclusion and the majority's interpretation of the statute.

The majority's interpretation rests on the premise that the statute is clear and unambiguous on its face. In my view, such is not the case.

The majority holds that since the purpose of formal written advisement of rights is to protect those who are forced to appear, § 16–5–204(4)(b), C.R.S. (1986 Repl.Vol. 8A) applies only to subpoenaed grand jury witnesses. Its holding is based upon a reading of this subsection in the context of the preceding one, § 16–5–204(4)(a), C.R.S. (1986 Repl.Vol. 8A). Under its interpretation, only witnesses subpoenaed without a formal written advisement would be immune from prosecution under the non-advisement immunity subsection.

A statute should be construed as a whole to give consistent, harmonious, and sensible effect to all of its parts and to render it effective in accomplishing the purpose for which it was enacted. Thus, if separate clauses within a statute may be reconciled by one construction but would conflict under a different interpretation, a construction which results in harmony rather than inconsistency should be adopted. *People v. District Court,* 713 P.2d 918 (Colo.1986).

In my view, the plain meaning of the language warrants a different interpretation from that of the majority. Section 16–5–204, C.R.S. (1986 Repl.Vol. 8A) sets forth the procedures applicable to all witnesses appearing before the grand jury, both voluntarily and involuntarily. The required advisement subsection states: "At the option of the prosecuting attorney, a grand jury subpoena may contain an advisement of rights." The advisement required under this subsection notifies witnesses of the right to an attorney, the privilege against self-incrimination, and the right to have an attorney appointed if the witness cannot afford one.

Subsection 16–5–204(4)(b) provides:

*any* witness who is not advised of his rights pursuant to paragraph (a) of this subsection (4) shall not be prosecuted or subjected to any penalty or forfeiture for

or on account of any transaction, matter, or thing concerning which he testifies or any evidence he produces, nor shall any such testimony or evidence be used as evidence in any criminal proceeding, except for perjury, against him in any court. (emphasis added)

Since I conclude that subsection (4)(b) confers prosecutorial immunity on invited witnesses, such witnesses cannot "waive" their right not to be prosecuted.

The term "any witness" in this subsection, given its plain meaning, encompasses all witnesses not advised of their rights on a subpoena issued under § 16–5–204(4)(a). *See Obert v. Colorado Department of Social Services,* 766 P.2d 1186 (Colo.1988) ("any" broadly interpreted to mean without restriction or limitation).

Thus, I conclude that the plain meaning of subsection (4)(b) protects all witnesses testifying without a subpoena containing a formal written advisement. However, when subsection (4)(b) is read in context with the other sections of the statute, the scope of "any witness" becomes narrower, but not as narrow as the majority holds.

Section 16–5–204(3)(b), C.R.S. (1986 Repl. Vol. 8A) gives the grand jury the right to "call and interrogate witnesses." Section 16–5–204(4)(*l*), C.R.S. (1986 Repl.Vol. 8A) permits any person to "approach the prosecuting attorney or the grand jury and request to testify or retestify in an inquiry before a grand jury or to appear before the grand jury."

My reading of subsection (4)(b) in context with the other statutory provisions, mandates that it be construed to include all witnesses who are not subpoenaed under subsection (4)(a) but who do not appear of their own initiative under § 16–5–204(4)(*l*).

When the language of the statute is construed as a whole and § 16–5–204(4)(b) is read in context with other provisions, my interpretation gives a more harmonious effect to the entire statute than does the majority's interpretation.

Subsection 4(b) provides immunity from prosecution to "any witness who is not advised of his rights pursuant to [subsection 16–5–204(4)(a) ]...." "Any witness" is not defined in the statute. Section 16–5–204(4)(b) does not specify whether "any witness" must be a subpoenaed witness.

To assist in understanding the scope of § 16–5–204(4)(b) it is instructive to look at other similar provisions of the statute. Significantly, § 16–5–204(4)(d), C.R.S. (1986 Repl.Vol. 8A) refers to "any witness subpoenaed to appear and testify before a grand jury or to produce books, papers, documents, or other objects before such grand jury...." *See also* § 16–5–204(4)(h), C.R.S. (1986 Repl. Vol. 8A) ("any witness summoned to testify before a grand jury"). Thus, when the General Assembly wished to limit a statutory provision to subpoenaed or summoned witnesses, it knew how to do so. The absence of such specificity in § 16–5–204(4)(b) lends weight to the argument that the phrase "any witness who is not advised of his rights pursuant to [§ 16–5–204(4)(a) ]" is not limited to subpoenaed witnesses.

Nonetheless, I agree that subsection (4)(b) could be interpreted to apply only to subpoenaed witnesses, as the majority holds. Alternatively, it could be interpreted, as Bergen contends, to apply broadly to all witnesses who were not advised of their rights pursuant to subsection (4)(a), including witnesses who request to testify under § 16–5–204(4)(*l*), as the plain meaning of the term "any" warrants.

However, § 16–5–204(3)(b) provides additional insight into the intended scope of "any witness." That subsection gives grand juries the right to "call" witnesses. *Black's Law Dictionary* 185 (5th ed. 1979) defines "call" as "to make a request or demand; to summon or demand by name...." *See also Webster's Third New International Dictionary,* 317–318. Thus, when "call" is given its plain meaning, the statute provides the grand jury the right to invite witnesses to testify or subpoena witnesses to appear.

In construing the language of all the pertinent statutory provisions to render each subsection harmonious with the others, I conclude that subsection (4)(b) was intended to be read broadly to include invited witnesses.

The grand jury has the right to invite witnesses to appear. Invited witnesses are not given a formal written advisement under subsection (4)(a) because they are not subpoenaed. However, invited witnesses do not come within § 16–5–204(4)(*l*) because they do not appear before the grand jury at their own request.

If the statutory language leads to alternative constructions and its intended scope is unclear, a court may examine pertinent legislative history to determine which construction is more in accordance with the objectives of the legislation. Constructions which defeat the obvious legislative intent should be avoided. *See* § 2–4–212, C.R.S. (1980 Repl. Vol. 1B); *People v. District Court, supra.*

These alternative constructions of subsection (4)(b) render the statute sufficiently ambiguous to warrant consideration of the legislative history.

One of the primary purposes of the reforms to the grand jury statute proposed in the 1977 legislative session was to provide witnesses with protections against prosecutorial misconduct, including harassment, perjury traps, and prosecutors' use of the grand jury to circumvent constitutional protections and gain access to otherwise protected information. As part of this reform, the General Assembly intended to protect target witnesses by requiring that they receive a formal written advisement of rights, access to previous grand jury testimony, access to other statements attributed to the subpoenaed witness in the prosecutor's possession, the right to have counsel present during testimony, and the ability to have a court review the proceedings for probable cause. *See* Tape Recordings of Senate Judiciary Committee on S.B. 186, 51st General Assembly, 1st Session (February 16 and March 7, 1977) (S.B. 186 Hearings).

The legislative history further indicates that the General Assembly's intent in providing for a written advisement on the subpoena instead of during the hearing was to notify target witnesses of their rights prior to testifying. This advisement was required for every witness in the initial bill, but was later amended as a compromise to require an advisement only for potential target witnesses.

The advisement was designed not only to protect target witnesses from self-incrimination but to allow them to seek counsel and to permit them to exercise other rights provided in the statute, such as obtaining statements in the prosecution's possession. S.B. 186 Hearings, *supra; see People ex rel. Gallagher v. District Court,* 198 Colo. 468, 601 P.2d 1380 (1979) (failure to subpoena witness with written advisement of rights prior to grand jury hearing denied witness' privilege against self-incrimination because it prevented him from exercising that privilege prior to the hearing).

The legislative testimony also reveals that subsection (4)(b) was intended to protect both subpoenaed and invited witnesses not identified initially as "target witnesses" but who might become target witnesses on the basis of their grand jury testimony. One senator expressed a particular desire to create substantive rights for any witness who could become a target. S.B. 186 Hearings, *supra.*

A representative from the District Attorneys' Association agreed that subsections (4)(a) and (4)(b) offered a good compromise. He maintained: "[M]y solution ... is these matters of notice and advisement apply to anybody you know is or would become a defendant and without that [notice and advisement] they [sic] wouldn't become a defendant." He also agreed that if a district attorney later charged or indicted an unadvised witness, that failure to give notice and advisement would be grounds to quash an indictment. S.B. 186 Hearings, *supra.*

Even though the majority concludes that the statute is clear on its face, it discusses the legislative history and recognizes that "the primary focus of the reformers was to provide expanded rights for 'target witnesses.'" Despite its acknowledgment of this legislative intent, the majority concludes that "target witnesses" can waive their statutory right to a subpoenaed advisement by voluntary appearance.

In my view, the legislative history demonstrates that the General Assembly intended to protect any witness who was or could become the target of the grand jury investi-

gation by providing such a witness with the specific safeguards contained in subsection 4(a). It further shows a legislative intent that target witnesses or potential target witnesses not afforded the statutory protections not be prosecuted.

Furthermore, *People ex rel. Gallagher v. District Court, supra,* is distinguishable. There, the supreme court dismissed an indictment because the prosecution failed to subpoena a witness pursuant to § 16–5–204(4)(a); the record demonstrated that the witness was notified that he would be subpoenaed to appear but no subpoena was ever issued. The supreme court rejected the prosecution's argument that the witness' voluntary appearance constituted a waiver of service of the subpoena. It held that since the prosecution failed to comply with § 16–5–204(4)(a) and Crim.P. 6.1, the witness could not be prosecuted because § 16–5–204(4)(b) prohibited prosecuting unadvised witnesses.

In dictum the supreme court implied that a witness appearing voluntarily may waive service of the subpoena and the rights and protections afforded under that subpoena. However, it did not address the issue specifically because the trial court had found that the witness did not appear voluntarily.

Here, Bergen did not initially request to testify pursuant to § 16–5–204(4)(*l*). Instead, the People invited her to testify and warned that an indictment against her might be forthcoming. Thus, Bergen's initial appearances cannot be construed as a waiver of her rights because she was not a witness under § 16–5–204(4)(*l*).

I would hold that an invited witness is afforded immunity from prosecution under subsection (4)(b) because he or she is neither a witness requesting to testify nor a subpoenaed witness, afforded rights and protections under subsection 4(a). Thus, I would conclude that the indictment must be dismissed on this basis.

## II. Constitutionality of the Dogfighting Statute

I would also conclude that the dogfighting statute must be construed narrowly here so as to exempt Bergen's conduct and to avoid a finding of unconstitutionality.

The statute which formed the predicate for Bergen's convictions, § 18–9–204, C.R.S. (1986 Repl.Vol. 8B), provides in pertinent part:

(1)(a) No person shall cause, sponsor, arrange, hold, or encourage a fight between dogs for the purpose of monetary gain or entertainment.

(b) For the purposes of this section, a person encourages a fight between dogs for the purposes of monetary gain or entertainment if he:

(I) Is knowingly present at such a fight. . . .

Bergen contends that she was improperly convicted for being "knowingly present" at a dogfight, in part because attending such a fight in her capacity as a news reporter was constitutionally protected under the First Amendment.

The United States Supreme Court has held that news-gathering is not without its First Amendment protection, for "without some protections for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626, 639 (1972). However, the court also declared in that case that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." 408 U.S. at 684, 92 S.Ct. at 2658, 33 L.Ed.2d at 641. *See Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (federal government's refusal to validate passports to Cuba sustained even though such action restricted flow of information concerning that country). Moreover, the state has a legitimate interest in prohibiting attendance at animal fights. *See City of St. Louis v. Schoenbusch,* 95 Mo. 618, 8 S.W. 791 (1888). Accordingly, the state might be able constitutionally to prohibit all persons from attending dogfights and criminalize such conduct.

Here, however, § 18–9–204 does not prohibit all persons from attending dogfights. Rather, the prohibition extends to those, *in-*

*ter alia,* encouraging a dogfight "for the purpose of monetary gain or entertainment."

Statutes are not unconstitutional because of facial overbreadth unless the overbreadth is "not only real but substantial as well, judged in relation to the statute's plainly legitimate sweep." *People v. Batchelor,* 800 P.2d 599, 601 (Colo.1990), *citing Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). Moreover, statutes confronting First Amendment freedoms must be specific enough not to inhibit the exercise of those freedoms. *People v. Batchelor, supra.*

Bergen argues that the statute is unconstitutionally overbroad because it operates to prevent a journalist from presenting a brief and simple demonstration in which precautions are taken to assure that the dogs will not be injured. To the extent that Bergen seeks special protection for journalists under her overbreadth claim, I would reject her argument. *See Branzburg v. Hayes, supra.*

However, I perceive that the statute here should be construed as facially overbroad because, unless narrowly construed, it would bring within its terms actions clearly beyond the statute's "plainly legitimate sweep." *See Whimbush v. People,* 869 P.2d 1245 (Colo. 1994) (Colorado's criminal extortion statute facially overbroad); *People v. Smith,* 862 P.2d 939 (Colo.1993) (Colorado's harassment statute facially overbroad).

Construed as the People urge and the majority holds, the statute effectively establishes a presumption that any individual "knowingly present" at a dogfight "encourages a fight between dogs for the purpose of monetary gain or entertainment...." *See* § 18–9–204(1)(b), C.R.S. (1986 Repl.Vol. 8B). Indeed, the majority concludes that the statute even applies to "disgusted observers" at dogfights. Thus, for example, a humane society member who seeks to investigate and expose the evils of dogfighting could be brought within the sweep of the statute under the majority's interpretation. Similarly, researchers, investigators, reporters, and even animal control officers could be brought within the terms of the statute if it is interpreted broadly as the majority maintains is appropriate. Thus, the conduct of various

categories of people in addition to journalists may be criminalized by the dogfighting statute as construed by the majority.

I recognize that two other courts have held constitutional against overbreadth challenges cock fighting statutes that prohibit individuals from being "knowingly present." *See State v. Tabor,* 678 S.W.2d 45 (Tenn.1984); *Peck v. Dunn,* 574 P.2d 367 (Utah 1978).

In both cases, however, the courts noted that the statutes applied to spectators, thereby making the statutes analogous to the limitation in § 18–9–204 to those attending dogfights "for the purpose of monetary gain or entertainment." Indeed, in *State v. Tabor, supra,* cited by the majority, the court noted that it was not passing on the question of whether investigators, news reporters or other completely innocent persons might have a First Amendment right to attend cock fights since the defendants did not allege they were within these categories. *Cf. State v. Abellano,* 441 P.2d 333 (Haw.1968) (mere "presence" requirement held unconstitutional).

*People v. Superior Court,* 247 Cal.Rptr. 647, 201 Cal.App.3d 1061 (1988), also relied upon by the majority, is distinguishable. There, the court upheld a statute punishing knowing presence of spectators at animal fights against a vagueness challenge by narrowly interpreting the statute. No challenge was made to the statute on overbreadth grounds.

Moreover, the "knowing" requirement in the dogfighting statute does not save it from overbreadth concerns. *See Whimbush v. People, supra* (a specific intent requirement does not eliminate overbreadth concerns when the effect associated with the intent provision encompasses a substantial amount of protected activity).

It is a cardinal rule of statutory construction that courts must construe statutes in such a manner as to avoid, if possible, finding them unconstitutional. *See* § 2–4–201(1)(a), C.R.S. (1990 Repl.Vol. 1B); *Whimbush v. People, supra* (Lohr, J., dissenting) (criminal extortion statute should be construed narrowly to avoid finding of facial overbreadth). We must also interpret statutes to give effect to the purpose and intent of the General

Assembly. *See In re Petition of S.O.,* 795 P.2d 254 (Colo.1990).

Here, the statute as construed by the majority would bring within its sweep constitutionally protected conduct not only for journalists but for others as well. In order to avoid such a finding of unconstitutionality, I would interpret the statute narrowly so that the phrase "encourages a fight between dogs for the purpose of monetary gain or entertainment" applies only to the attendee at a dogfight who is knowingly present "for the purpose of monetary gain or entertainment." Under this construction, a humane society member attending a dogfight to investigate and expose its evils would not be presumed to be there for purposes of monetary gain or entertainment and, thus, would not come within the embrace of the statute. Similarly, an animal control officer would not be acting for the purpose of monetary gain or entertainment and would not be at risk for prosecution by attending a dogfight.

Here, Bergen claimed that she personally was not entertained by the dogfight she witnessed. Similarly, it is arguable whether she received any monetary gain from attending the dogfight. She was not betting on the dogfight, and she would have received her salary from the television station which employed her whether she was working on the dogfight story or another story. Thus, consistent with my construction of the statute, the jury should have been instructed that it must acquit Bergen if it found she was not present at the dogfight for purposes of monetary gain or entertainment.

Indeed, this interpretation is consistent with the legislative intent, which was to prohibit entertainment and gambling for dog owners and spectators at dogfights, since such dogfights were viewed as "a kind of animal cruelty which should be treated as a serious crime." Tape recordings of Hearings before the House Judiciary Committee on Senate Bill 183, 59th General Assembly, 1st Session (April 14, 1981). This interpretation is also consistent with those of other courts which have construed similar statutes to apply only to those attending animal fights purposefully and intentionally. *See State v. Tabor, supra; People v. Superior Court, su-*

*pra.* Significantly, I am aware of no other case upholding a conviction against one attending an animal fight for any purpose other than personal enjoyment.

If one of the alternative means of committing the offense charged is to perform an act protected by the constitution, a general verdict of guilt for that offense must be set aside. *James v. People,* 727 P.2d 850 (Colo. 1986). Similarly, if, as here, one of the alternative means of committing the offense charged is not within the scope of a statute, so as to avoid a finding of that statute's unconstitutionality, the general verdict of guilt must be set aside as well. Here, the jury did not specify which among the alternative acts or purposes set forth in § 18–9–204 was the basis for its general verdict, so it is impossible to know on which theory Bergen's convictions were based. Thus, since Bergen's convictions for dogfighting, conspiracy to commit dogfighting, and accessory to dogfighting all rely on an impermissibly broad interpretation of the dogfighting statute, I would set aside her convictions.

### III. Prosecutorial Misconduct

The majority opinion addresses only one part of a two-part allegation of prosecutorial misconduct made by Bergen. The majority responds only to Bergen's allegation that the prosecution conducted a number of "off the record" proceedings which amounted to prosecutorial misconduct. However, more significantly, Bergen also contends that the prosecution's intentional cancellation of her subpoena in order to avoid providing her with statements in its possession attributed to her, as required under the grand jury statute, amounted to prosecutorial misconduct undermining the structural fairness and integrity of the grand jury statute.

#### A.

As to this latter contention, I would hold that there is sufficient evidence to warrant dismissal of the indictment based on the prosecution's intentional cancellation of the subpoena in order to deny Bergen other statutory rights.

Here, the prosecution admittedly cancelled Bergen's subpoena to avoid having to provide her with statements in its possession attributed to her as required under § 16–5–204(4)(h), C.R.S. (1986 Repl.Vol. 8A). The prosecution did not want Bergen to know it had caught her in a perjury trap. This is the type of blatant misconduct that I believe warrants dismissal of the indictment.

The majority holds that an indictment can be dismissed if the defendant shows actual prejudice, but it then concludes that Bergen did not meet this test. The majority also recognizes that an indictment may be dismissed if the prosecutorial misconduct undermines the integrity of the grand jury proceedings, but determines there was no such misconduct here.

A court may exercise its supervisory power to protect judicial integrity in the face of governmental misconduct which amounts to a denial of due process. *People v. Auld*, 815 P.2d 956 (Colo.App.1991). A court may dismiss a grand jury indictment because of prosecutorial misconduct when those "few, clear rules which were carefully drafted ... to ensure the integrity of the grand jury's functions" have been violated. *United States v. Williams*, 504 U.S. ——, ——, 112 S.Ct. 1735, 1741, 118 L.Ed.2d 352, 364 (1992). Supervisory dismissal is warranted when the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

Unlike the limited statutory protections given to grand jury witnesses on the federal level, the General Assembly has adopted broad protections for its grand jury witnesses under § 16–5–204. Thus, Colorado grand jury witnesses are afforded more protection than is constitutionally required.

Here, the prosecution violated statutory provisions intended to protect grand jury witnesses from self-incrimination. The language of § 16–5–204(4)(a) and (b) explicitly requires that witnesses receive a subpoena containing formal written advisement of their rights or they cannot be indicted, except for perjury. Furthermore, § 16–5–204(4)(h) requires that the prosecution provide subpoe-naed witnesses with copies of statements attributed to them prior to testifying. The language of this subsection is clear: any witness who is required to appear before the grand jury has the right to examine any statement the prosecution possesses which is attributed to that witness. *See also* § 16–5–204(4)(g), C.R.S. (1986 Repl.Vol. 8A).

The majority simply concludes that Bergen was not entitled to her statements because she was not under a subpoena. It fails to address the admitted intent of the prosecution in cancelling the subpoena to prevent Bergen from obtaining statements in the prosecution's possession attributed to her. Nor does the majority note that Bergen's subpoena was not cancelled until after the trial court issued an order directing the People to provide Bergen with copies of her prior statements.

The General Assembly specifically enacted §§ 16–5–204(4)(g) and (4)(h) to prevent the prosecution from using witnesses' prior statements to ensnare them in a perjury trap. *See* S.B. 186 Hearings, *supra*. By allowing witnesses to review their previous testimony and other statements in the prosecution's possession, the General Assembly attempted to eliminate perjury traps and allow witnesses the opportunity to exercise their right against self-incrimination.

Under my interpretation of the statute, once the prosecution cancelled the subpoena to avoid providing Bergen with statements attributed to her, it relinquished its right to indict her based upon her subsequent grand jury testimony because the protections the subpoena ensured were no longer present. This is the type of fundamental misconduct that compromises the basic structural protections intended by the General Assembly. Accordingly, I would dismiss the indictment.

Furthermore, the indictment should be dismissed to protect the integrity of the grand jury proceedings. The legislative history indicates the reforms to the grand jury statute were spurred by prosecutorial abuses of the grand jury process. Unless the court's supervisory power is invoked here, the integrity of the grand jury process will again be diminished.

### B.

I also disagree with the majority that the admitted prosecutorial violations of the grand jury statute and Colorado Rules of Criminal Procedure did not warrant remedial action. If the indictment were not dismissed, these other violations were sufficiently alleged to have required a further evidentiary hearing.

Bergen alleged, based upon an affidavit obtained from the court reporter, that prosecutors spoke with grand jurors off the record, that grand jurors were invited to the prosecution's offices, and that the prosecution corrected transcripts of the proceedings without consent from the court. Bergen also claims, based on the court reporter's affidavit, that the prosecutors instructed the grand jury not to question target witnesses directly.

All of this conduct violates provisions of § 16–5–204 and Crim.P. 6.4. The prosecution admitted that this misconduct occurred but downplayed its nature and extent. In my view, Bergen's allegations warrant a hearing to determine the extent of the misconduct and the prejudice to defendant.

Crim.P. 52(a) provides that "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." However, dismissal is required when actual prejudice accrues to a defendant because of prosecutorial misconduct, and whether there was prejudice to the defendant is a factual determination best resolved by the trial court. *People v. Rickard,* 761 P.2d 188 (Colo.1988).

The majority holds that the alleged violations were technical and therefore harmless. It also concludes that the secrecy of the grand jury proceedings would be breached if Bergen were allowed to call the court reporter and grand jurors to testify. In so holding, the majority concludes that a hearing could not have made a difference because sufficient evidence on which to base the indictment was presented regardless of what evidence would have been elicited at such hearing.

I disagree with this analysis. The majority improperly concludes that the grand jurors would be required to discuss the reasons and basis for their indictment. However, the only testimony Bergen sought to elicit from the grand jurors and the court reporter was the nature of the "off-the-record" conversations held.

The majority also concludes that the defendant failed to establish any prejudice from the alleged prosecutorial misconduct based on the affidavits submitted. Again, I disagree.

One affidavit from the court reporter clearly states that she cannot go into the details of "off-the-record" conversations without the court's permission. If a hearing had been held, then the court would know with certainty the nature and extent of the prosecutor's conduct and whether any prejudice occurred.

Absent a finding that the prosecutors' conduct was prejudicial, dismissal of the indictment was not warranted. However, I believe that Bergen sufficiently established the presence of enough prosecutorial misconduct to warrant a hearing on whether it was actually prejudicial.

The record demonstrates that the prosecution admitted to off-the-record conversations during the grand jury proceedings, although it explained that these conversations were administrative in nature, concerning such topics as when to reconvene and when to take a break. The prosecution further admitted that grand jurors were invited to the district attorney's office to review transcripts of testimony which occurred during sessions they could not attend but that only "pleasantries" were exchanged. Also, the prosecution admitted that it corrected the grand jury transcripts without court permission; it explained that the only corrections made were typographical and supplied the list of the corrections it requested to be made.

However, since the court reporter declared in her affidavit that she could not divulge the details of the prosecutor's conduct because of her oath of secrecy, Bergen was prevented from establishing the extent of the statutory violations. *See* § 16–5–204(4)(f), C.R.S. (1986 Repl.Vol. 8A). Thus, in order to ensure that defendant was not prejudiced by the misconduct, a hearing was necessary. *See People v. District Court,* 199 Colo. 398, 610 P.2d 490 (1980) (grand jury secrecy may be breached

when clear examples of inappropriate conduct may affect the validity of the indictment).

Accordingly, I would either dismiss the indictment, or, at a minimum, I would remand for an evidentiary hearing regarding the prosecution's off-the-record conduct.